IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA, DURHAM DIVISION
CIVIL CASE NO. 1:14-CV-697

BRADLEY ELMENDORF, )
)
         Plaintiff, )
) COMPLAINT
   v. ) (Jury Trial Requested)
)
DUKE UNIVERSITY, )
)
         Defendant. )

NOW COMES Plaintiff Bradley Elmendorf, by and through undersigned counsel, and alleges as his Complaint against Defendant Duke University, as follows:

## INTRODUCTION

This is an action for disability discrimination under the Americans with Disabilities Act and the Rehabilitation Act, and for violations of State law. Mr. Elmendorf has Reading Disorder, a learning disability also known as Dyslexia. Mr. Elmendorf overcomes his reading difficulties by listening to, rather than visually reading, articles and books. To access printed material, Mr. Elmendorf relies on technology that is able to "read" text displayed on a computer screen out loud to him.

Mr. Elmendorf chose to attend Duke University (Duke) based on its assurances that it was familiar with Dyslexia and was fully prepared to provide him with audio versions of all of his reading assignments. Duke failed to provide assignments in audio formats. As a direct result, Mr. Elmendorf had to withdraw or take an incomplete in many courses, and ultimately, scale back on his goal to graduate with a Masters in Divinity in favor of a less rigorous and less valuable Master of Arts in Christian Studies. When Mr. Elmendorf pursued an internal grievance with Duke regarding the discrimination he had experienced, and he was told to abandon the grievance or lose his scholarship.

Duke charged Mr. Elmendorf the same tuition and fees as it charged his peers but did not provide him with equal educational opportunity. Mr. Elmendorf brings this action to challenge Duke's misrepresentations about its ability to accommodate him. Mr. Elmendorf also brings this

1

action to challenge Duke's failure to provide him with equal access to its educational program as constituting illegal discrimination based on his disability.

## JURISDICTION AND VENUE

1. This action is authorized and instituted pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794a, Title III of the Americans with Disabilities Act, 42. U.S.C. §§ 12181, *et seq.*, North Carolina General Statutes §75-1.1, and common law.

2. Jurisdiction of this court is invoked pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), 1367 (supplemental jurisdiction).

3. Declaratory and further relief are authorized by 28 U.S.C. §§ 2201 & 2202.

4. Venue in this court is appropriate pursuant to 28 U.S.C. § 1391(b). A substantial part of the events or omissions giving rise to the claim occurred at Defendant's Durham, North Carolina campus.

## PARTIES

5. Plaintiff Bradley Elmendorf is a U.S. citizen.

6. Mr. Elmendorf attended Duke University from 2012 to 2014, and was awarded a Master of Arts in Christian Studies in May 2014.

7. Duke University (Duke) is a not-for-profit corporation registered with the North Carolina Secretary of State. Its principal office is located in Durham, North Carolina.

8. Duke is a recipient of federal financial assistance that participates in the Federal Student Aid program of the Department of Education.

9. Duke participates in business and commercial activities in addition to its sale of educational services, including the sale of branded merchandise, food, tickets to athletic events and other goods and services.

## STATEMENT OF FACTS

<u>Mr. Elmendorf's Disability</u>

10. Mr. Elmendorf has a history of learning difficulties.

2

11. Mr. Elmendorf is diagnosed with the learning disabilities of Reading Disorder, also known as Dyslexia, and Mathematics Disorder.

12. A learning disability is the difference between a person's intelligence and expected level of achievement and actual performance.

13. Mr. Elmendorf reads visually at a second grade reading level, does not read efficiently, and must exert great effort to keep his place while reading.

14. Mr. Elmendorf's ability to read printed text is significantly below what would be expected given his measured ability and achievement.

15. Mr. Elmendorf also experiences difficulty switching his focus between things that are near and far. In a classroom setting, this makes it challenging for Mr. Elmendorf to look at his professor, look down at his desk where he is taking notes, look back up at his professor or at the blackboard at the front of the room, look down again at his notes, etc.

16. Mr. Elmendorf is substantially limited in his ability to read and concentrate.

17. Mr. Elmendorf is able to raise his actual level of reading performance up to his expected level of achievement by listening to his reading assignments.

18. Once Mr. Elmendorf began receiving books in an audio format and other modifications (also called accommodations) for his disability during his undergraduate education, Mr. Elmendorf's undergraduate grades improved significantly.

Enrollment

19. In 2011, Mr. Elmendorf was accepted to the Master of Divinity programs at Duke and at Princeton Theological Seminary (Princeton).

20. Princeton offered Mr. Elmendorf a scholarship that would pay his full tuition costs and an additional stipend, and private loans that would be fully forgiven after he served in the pastorate for five years.

21. Duke offered Mr. Elmendorf a less comprehensive scholarship package that would cover some, but not all, of his tuition.

22. In April 2012, Mr. Elmendorf visited Duke and Princeton to learn more about their educational programs and their ability to accommodate his educational needs as a student with learning disabilities. Duke was aware that Mr. Elmendorf was visiting Princeton after leaving Duke.

23. At Duke, Mr. Elmendorf met with staff in the Student Disability Access Office (Disability Access) and the Divinity School. The staff assured Mr. Elmendorf that Duke had experience accommodating individuals with Dyslexia and was fully prepared to provide him with accessible formats of all of his reading assignments, including those assignments distributed directly to students by professors.

24. At Princeton, Mr. Elmendorf was told that the Princeton Theological Seminary had not had prior experience accommodating an individual with Dyslexia, but would try to meet his needs.

25. Mr. Elmendorf chose to attend Duke and to incur additional out-of-pocket costs for his education based on Duke's assurances that it was able to fulfill his disability-related needs. Mr. Elmendorf reasoned that the extra costs were warranted by his need to ensure that he had appropriate accommodations in order to obtain his Master of Divinity degree.

Accommodation Plan with Duke Student Disability Access Office

26. Duke is obligated to provide auxiliary aids and services and other accommodations to students with disabilities when needed to access Duke's educational programs. A failure to do so constitutes discrimination based on disability.

27. Disability Access is the office responsible for fulfilling Duke's obligations to students with disabilities.

28. In July 2012, Mr. Elmendorf submitted all requested documentation and paperwork in support of his request for accommodations for his learning disabilities to Disability Access.

29. On August 2, 2012, Disability Access notified Mr. Elmendorf of his eligibility for disability-related modifications to its educational program, including alternate (audio) formats of course material, handouts, and books.

30. Duke agreed to create alternate formats by scanning the reading material and creating a PDF file, and then using Optical Character Recognition (OCR) software to format the PDF file such that a screen reading program could recognize the images on the page as words and read them aloud.

31. On August 17, 2012:

    a. Disability Access formalized its plan to provide Mr. Elmendorf with testing modifications, and course materials, handouts, and books in alternate formats. Disability Access has never denied or disputed that Mr. Elmendorf requires these accommodations to enjoy equal access to its educational program.

    b. Disability Access informed Todd Maberry of Mr. Elmendorf's accommodations. Mr. Maberry was the Disability Liaison at the Divinity School responsible for implementing Mr. Elmendorf's accommodations. However, course materials and handouts in an alternate format were not on the list of accommodations given to Mr. Maberry.

    c. Mr. Maberry refused to meet with Mr. Elmendorf about his accommodations, stating that he did not meet with students about accommodations until after the first week of classes.

<u>Fall 2012</u>

32. Duke uses an online platform called Sakai. When logged in to Sakai, a student could access course web pages that included content from his professors and teaching staff.

33. Mr. Elmendorf was regularly assigned to read articles or excerpts from books that had been scanned to a PDF file and posted to a Sakai course web page. Students could either read the document on their computer screen or print out a hard copy to read. The Sakai reading assignments frequently formed the basis of class discussions and writing assignments.

34. Mr. Elmendorf quickly found that Duke had not formatted the reading assignments on Sakai such that a screen reader could accurately process the data.

35. Mr. Elmendorf was surprised that his need for alternate formats was becoming an issue. In his application to Duke, he included a letter from his undergraduate disability services office highlighting his need for books in an audio format, and had stressed the importance of audio formats of all of his course assignments in his pre-enrollment meetings with Mr. Maberry and staff from Disability Access.

36. On August 30 and 31, 2012, Mr. Elmendorf contacted Disability Access and notified them that he had not received an alternate format of his Sakai assignments and other course materials. None were provided.

37. On September 5, 2012, Mr. Elmendorf met with Mr. Maberry. Mr. Elmendorf had received some but not all of his textbooks in an alternate format, and had yet to receive other non-textbook course materials or handouts in an alternate format. Mr. Elmendorf told Mr. Maberry that he urgently needed Sakai reading assignments in an alternate format.

38. On September 6, 2012, Mr. Maberry notified Mr. Elmendorf's professors of his approved accommodations and noted that Mr. Elmendorf lacked access to "PDFs on Sakai," but did not explain what that meant and did not tell the professors how to make the PDFs readable.

39. On September 6, 10, 11, 14, 2012, Mr. Elmendorf e-mailed and/or visited Disability Access to discuss his need for textbooks and/or Sakai reading assignments in an alternate format. Disability Access provided Mr. Elmendorf with alternate formats of his textbooks but not his Sakai assignments. Disability Access took the position that the accessibility of the Sakai assignments was Mr. Maberry's responsibility. Mr. Elmendorf also requested, but was told he was not eligible for, a note taker.

40. On September 10, 11, 12, and October 4, 23, 2012, Mr. Elmendorf again requested alternate formats of Sakai reading assignments from Mr. Maberry; none were provided.

6

41. On October 23, 2012, Anne Marie Boyd, a Duke Librarian, agreed to convert Mr. Elmendorf's Sakai readings to an alternate format. Mr. Maberry instructed Mr. Elmendorf to coordinate with the Library regarding his accommodations. At that point, Mr. Elmendorf was two months into the semester and had accumulated more than 700 pages of inaccessible, past-due Sakai reading assignments.

42. In October and November, Mr. Elmendorf received copies of his Sakai reading assignments from the Library. Many of the assignments were not converted properly and were unreadable by the screen reader, and did not provide Mr. Elmendorf with the necessary access to his reading assignments.

43. By mid-November, Mr. Elmendorf concluded that he needed to take an incomplete in at least one course. He knew he could not keep pace with his current assignments while attempting to catch up on months' worth of past-due reading and writing assignments.

44. By late November, Mr. Elmendorf finalized arrangements to take an incomplete in two courses, Introduction to Old Testament Interpretation and Early and Medieval Christianity.

45. On December 4, 2012, Mr. Elmendorf met with Koren Robins, who had replaced Mr. Maberry as the Disability Liaison at the Divinity School, to discuss the accommodation failures he had experienced during the fall semester and his accommodations for the spring semester. It was agreed that Mr. Elmendorf would mitigate the harm caused by Duke's failure to accommodate him by withdrawing from or dropping a third class, Introduction to Ministry in Social Work.

46. Ms. Robins shared the details of her meeting with Mr. Elmendorf with Professor Sujin Pak, Associate Dean for Academic Programs at the Divinity School. Ms. Robins and Dean Pak also talked to Disability Access about Mr. Elmendorf's accommodations. Disability Access told Dean Pak that the Divinity School had a legal obligation to ensure that documents on Sakai were accessible, and were inviting a lawsuit while the documents remained inaccessible.

47. On information and belief, Disability Access did not instruct the Divinity School how to convert Sakai assignments to an alternate format.

48. On December 6, 2012, Dean Pak assured Mr. Elmendorf that the Divinity School would provide him with full access to all past, present, and future Sakai reading assignments. Dean Pak also asked Mr. Elmendorf to put the Duke Librarian in contact with his undergraduate disability services office at Seattle Pacific University to learn how to convert reading assignments to an alternate format.

49. On December 11, 2012, disability services staff from Mr. Elmendorf's undergraduate institution instructed the Duke Librarian how to convert reading material to an accessible format:

   a. Use a scanner with a tray that automatically feeds one page at a time into the scanner and set the machine to produce a high resolution PDF file.

   b. Use Optical Character Recognition (OCR) software to turn the PDF from a static image of a document to searchable, readable text that a screen reader program recognizes as words to be read out loud. Use of a dedicated OCR program (which would not include Adobe Acrobat Pro) is recommended because it provides additional formatting options that in turn provide a better experience for the student reading the document.

   c. Proof the resulting document by copying and pasting text from the PDF file into a Word document, which displays the text the screen reader is "seeing."

50. On December 18, 2012, Ms. Robins provided Mr. Elmendorf with documents that had not been properly converted to an alternate format. Mr. Elmendorf referred her to the Duke Librarian to learn how to properly convert a document to an alternate format.

51. On December 20, 2012, Ms. Robins claimed that she could not test the accessibility of the document because she did not have access to Mr. Elmendorf's screen reading program. Ms. Robins did not need access to a screen reader; she could have tested the accessibility of the converted documents by cutting and pasting text from the PDF file into a Word file.

52. At the end of the Fall 2012 semester, Mr. Elmendorf had three incompletes and had yet to have access to all course content.

Spring 2013

53. Neither Disability Access nor the Divinity School notified Mr. Elmendorf's professors of his approved accommodations for the Spring 2013 semester.

54. Mr. Elmendorf began receiving reading assignments that had not been properly scanned and/or formatted.

55. On January 15, 2013, Ms. Robins admitted that she had failed to check the accessibility of the documents and would rectify the situation.

56. The next day, Ms. Robins again provided Mr. Elmendorf improperly converted reading material. It had been scanned such that two pages appeared on one scanned page and had not been converted correctly, which resulted in the screen reader reading from left to right across both pages instead of reading one page at a time.

57. At that point, the semester was well under way and Mr. Elmendorf had no realistic prospect of immediately transferring to another university. His current transcript consisted of three incompletes and one B+.

58. Mr. Elmendorf began to seriously consider dropping out of Duke. Dean Pak strongly encouraged Mr. Elmendorf to take a leave of absence, and told him she would put him on an involuntary leave of absence if he accumulated any more incompletes.

59. Rather than dropping out or taking a leave of absence, Mr. Elmendorf reduced his course load and began researching his ability to transfer to a shorter masters program. Mr. Elmendorf decided to apply to the one-year Master of Arts in Christian Studies (MACS) program, the shortest degree program he could enroll in at the Duke Divinity School.

60. Mr. Elmendorf consulted with the Duke Financial Aid office and learned that his federal financial aid eligibility was in jeopardy because of the incompletes on his transcript. It was imperative that he transfer to the MACS program to credibly demonstrate that he was making adequate progress towards a degree to remain eligible for aid.

61. Financial Aid officials confirmed in writing to Mr. Elmendorf that he would retain his Westbrook Scholarship as a student in the MACS program.

62. Mr. Elmendorf remained at Duke out of necessity to mitigate the harm caused by the lack of accessible course material. He could not transfer to another university while his transcript consisted primarily of incompletes, he could not pursue a Master of Divinity degree because he was no longer eligible for financial aid to complete that program, and he had to salvage his academic situation at Duke if he wished to pursue a marketable degree.

63. On March 28, 2013, Mr. Elmendorf, unable to continue to wait for Duke to convert Sakai reading assignments to an alternate format, reached out to his undergraduate disability services office for help; that office began converting and sending accessible documents to Mr. Elmendorf within hours.

64. In May, a Financial Aid officer told Mr. Elmendorf that he was not eligible for the Westbrook Scholarship as a student in the MACS program. Mr. Elmendorf was told that it was up to Reverend Shea, the Director of Admissions. Reverend Shea had previously told Mr. Elmendorf that he would remain eligible for the Westbrook but now told Mr. Elmendorf that only Dean Pak had the authority to award it.

<u>Mr. Elmendorf's Grievance with the Office of Institutional Equity</u>

65. On May 10, 2013, Mr. Elmendorf filed a grievance with Duke's Office of Institutional Equity regarding Duke's failure to provide him with equal access to its educational program.

66. On May 14, 2013, Dean Pak told Mr. Elmendorf that she would let him keep the Westbrook Scholarship only if he abandoned his grievance and signed a binding agreement waiving all of his rights to complain about the discrimination he experienced at Duke.

67. On May 17, 2013, Dean Pak confirmed her position via e-mail and letter.

68. On May 23, 2013, Mr. Elmendorf contacted Dr. John Blackshear, Student Ombudsman, for help.

69. On May 29, 2013, Mr. Elmendorf and the Student Ombudsman met with Dean Pak to discuss his continued lack of access to Duke's educational program. The Student Ombudsman told Dean Pak that she could not require Mr. Elmendorf to withdraw his grievance to retain his scholarship. Following the meeting, Dean Pak notified Financial Aid and the Director of Admissions to continue awarding Mr. Elmendorf the Westbrook Scholarship.

70. Later, the Student Ombudsman suggested that Mr. Elmendorf ask for an iPad from Disability Access. Disability Access denied Mr. Elmendorf's request, even though Mr. Elmendorf understood from the Student Ombudsman that iPads are routinely provided to undergraduates with the same Reading Disorder Mr. Elmendorf has.

71. On October 11, 2013, the Office of Institutional Equity (Equity) concluded its investigation into Mr. Elmendorf's claims of discrimination.

72. Equity stated that the delivery of accommodations was outside its purview, but made recommendations that identified failings that were at the heart of the discrimination Mr. Elmendorf experienced at Duke. Equity's recommendations included:

   a. That Disability Access and the Divinity School improve communications with one another regarding the provision of accommodations, which would have clarified the lines of accountability between the two offices with regard to Duke's obligation to provide Mr. Elmendorf with equal access to its educational program;

   b. Increase efficiencies in providing accommodations, which would have eliminated delays in providing Mr. Elmendorf with accessible reading material and enabled him to complete assignments at the same time as his peers; and

   c. Educate faculty regarding the delivery of modifications, which would have eliminated the need to rescan and convert already-scanned documents and would have provided Mr. Elmendorf with equal access to reading assignments.

73. Nevertheless, Equity stated that the delays in providing Mr. Elmendorf with modifications were attributable to technology issues outside the control of Disability Access or the Divinity School. The report did not indicate what, if anything, Mr. Elmendorf could have done differently to try to get Duke to comply with its nondiscrimination obligations.

Fall 2013

74. On August 12, 2013, Duke contacted each of Mr. Elmendorf's professors and instructed them that each reading assignment posted to Sakai must be single-paged readable PDFs, and if they were not, to request that Duke rescan the documents.

75. Rather than replace the inaccessible documents on Sakai with accessible versions, Duke provided the converted documents to Mr. Elmendorf via e-mail or on a flash drive, also known as a thumb drive or memory stick.

76. On August 26, 2013, Mr. Elmendorf notified the Disability Liaison and Dean Pak that they had provided him with inaccessible, improperly converted Sakai reading assignments. He stated that he had tried reading the document using Adobe and Ghost Reader, two programs that have read-out-loud functions.

77. Ms. Robins was adamant that the document was accessible because she had opened the document on multiple computers and each time Adobe read it out loud. She had apparently failed to notice that as Adobe read the document out loud, the content was nonsensical and did not correspond to the words on the page.

78. Dean Pak inaccurately stated that Mr. Elmendorf was the source of the problem because he had not used Adobe to read the document out loud.

79. On August 28, 2013, the Disability Liaison purportedly notified Mr. Elmendorf's professors of his approved modifications, including books in an alternate format.

80. Mr. Elmendorf continued to receive alternate formats of reading assignments after their due date, which affected his ability to complete assignments in a timely manner and to

12

Case 1:14-cv-00697-LCB-JEP   Document 1   Filed 08/15/14   Page 12 of 19

prepare for classes. He informed Ms. Robins of the continued timing problem on September 11, 2013.

81. On September 13, 2013, Mr. Elmendorf met with Dean Pak to explain why the alternate formats of his Sakai assignments had been inaccessible. Dean Pak stated that she understood that Duke's improper conversion of documents – not a particular screen reading program – had rendered Mr. Elmendorf's reading assignments inaccessible. They also reviewed and discussed Mr. Elmendorf's "accommodation letter," a document used by Ms. Robins to notify professors of his approved accommodations. Dean Pak and Mr. Elmendorf agreed that his accommodation letter should be edited to state that he had been approved to receive <u>all</u> printed material, not just books, in an alternate format. Dean Pak tasked Ms. Robins with editing Mr. Elmendorf's accommodation letter.

82. On September 17, 2013:
    a. Ms. Robins informed Mr. Elmendorf that she would not edit his accommodation letter as directed because she could only remove information from his accommodation letter, and could not add to or alter the letter in any way. She then sent the purportedly "revised" accommodation letter to Mr. Elmendorf's professors, which appeared to be identical in substance to the August 28th accommodation letter. Ms. Robins' letter made no mention of the professors' obligation to only post accessible material on Sakai.
    b. Mr. Elmendorf reiterated to Disability Access, the Divinity School, and Equity that he continued to receive readings in an alternate format in a randomized order. Mr. Elmendorf was receiving an alternate format of a reading assignment that was due weeks in the future followed by an assignment that was past due. As a result, Mr. Elmendorf could not complete assignments in the order they were due, nor could he credibly predict for his professors how much additional time he would need to complete an assignment.
    c. Mr. Elmendorf notified his Political Theology professor that he had yet to receive all of his assigned readings in an accessible format and may need extensions on some assignments.

83. Dean Pak and Ms. Robins told Mr. Elmendorf that they had been delayed in providing him with accessible versions of his Political Theology reading assignments because it was a new course.

84. On October 3, 2013, Mr. Elmendorf withdrew from Political Theology because he continued to lack accessible reading material and the professor was unwilling to otherwise facilitate his full participation in the course. Mr. Elmendorf was concerned that the lack of accommodations would ultimately lead to another incomplete grade, which Dean Pak had told him would trigger an automatic leave of absence.

Harm to Mr. Elmendorf

85. Based on Duke's representations about its ability to provide needed accommodations, Mr. Elmendorf gave up a full scholarship to Princeton Theological Seminary and attended Duke instead, incurring substantial expense as a result.

86. As a result of Duke's failure to provide the modifications it acknowledged Mr. Elmendorf was entitled to as a student with a disability, and Duke's persistent refusal to remedy its failings, Mr. Elmendorf was unable to complete the degree he went to Duke to obtain.

87. As a result of the discrimination he experienced, Mr. Elmendorf obtained a MACS degree in May 2014 at the conclusion of his two years at Duke. The MACS degree is a one-year program.

88. Duke's use of Sakai to distribute inaccessible course material denied Mr. Elmendorf the ability to independently acquire the same information, engage in the same interactions, and enjoy the same services within the same timeframe as individuals without disabilities with substantially equivalent ease of use.

89. Duke frequently failed to provide Mr. Elmendorf with alternate formats of his reading assignments that were equally effective as those available to his peers. He received alternate formats of reading assignments after his peers had completed the assignments. He also received alternate formats that did not communicate the same information available to his peers because they had not been converted properly.

90. Duke's failure to provide Mr. Elmendorf with alternate formats in a timely manner required that he take different tests, complete modified assignments, and otherwise be subjected to different measures of his academic performance than his peers.

91. Mr. Elmendorf's experience has been professionally and personally demoralizing. Mr. Elmendorf was forced to abandon his plan to obtain his Master of Divinity and work within the Church. Instead, he was limited to pursuing a MACS degree that has negligible value in the job market.

92. Mr. Elmendorf has sought counseling to help him cope with the emotional harm he suffered as a result of discrimination he experienced at Duke.

93. Mr. Elmendorf has incurred equal expenses as his peers but did not have equal access to the educational program.

## FIRST CLAIM FOR RELIEF
(Section 504 of the Rehabilitation Act)

94. Mr. Elmendorf incorporates and re-alleges paragraphs 1 through 93.

95. Mr. Elmendorf is a person with a disability protected by Section 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794(a).

96. Mr. Elmendorf is a qualified individual with a disability who met the academic and technical standards for admission to the Master of Divinity, and later, the Master of Arts in Christian Studies programs at the Duke University School of Divinity. *See* 34 C.F.R. § 104.3(l).

97. Duke receives federal financial assistance from the federal Department of Education and is subject to Section 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794; 34 C.F.R. § 104.3(h).

98. Recipients of federal financial assistance must "take such steps as are necessary to ensure that no handicapped student is denied the benefits of, excluded from participation in, or otherwise subjected to discrimination because of the absence of educational auxiliary aids." 34 C.F.R. § 104.44(d).

99. Duke discriminated against Mr. Elmendorf when it failed or delayed in providing him with accessible formats of his reading assignments, note taking services, and an iPad as accommodations for his disability, refused to rebind his books, and failed to take other steps to ensure that he was not denied benefits of, excluded from participation in, or otherwise subjected to discrimination while enrolled at Duke University.

100. Duke interfered with Mr. Elmendorf's attempts to assert his federally-protected rights and retaliated against him when it threatened to take away his scholarship if he pursued an internal grievance, which constituted a protected activity under the Rehabilitation Act.

101. Mr. Elmendorf was harmed by Duke's actions and has suffered damages as a result of Defendant's discriminatory practices.

## SECOND CLAIM FOR RELIEF
(Title III of the Americans with Disabilities Act)

102. Mr. Elmendorf incorporates and re-alleges paragraphs 1 through 101.

103. Mr. Elmendorf is a person with a disability protected by the ADA. *See* 42 U.S.C. § 12102.

104. Duke is a private post-secondary school, and is a place of public accommodation. *See* 42 U.S.C. §§ 12181(7)(J).

105. Title III of the ADA provides that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12181.

106. Title III requires that places of public accommodation take necessary steps to "ensure that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(ii) & (iii).

107. Duke discriminated against Mr. Elmendorf when it failed or delayed in providing him with accessible formats of his reading assignments, note taking services, and an iPad as accommodations for his disability, refused to rebind his books, and failed to take other

steps to ensure that he was not denied the benefits of, excluded from participation in, or otherwise subjected to discrimination in its educational programming.

108. Duke interfered with Mr. Elmendorf's attempts to assert his federally-protected rights and retaliated against him when it threatened to take away his scholarship if he pursued an internal grievance, which constituted a protected activity under the Americans with Disabilities Act.

109. Mr. Elmendorf was harmed by Duke's actions and has suffered damages as a result of Defendant's discriminatory practices.

### THIRD CLAIM FOR RELIEF
(Unfair or Deceptive Trade Practices)

110. Mr. Elmendorf incorporates and re-alleges paragraphs 1 through 109.

111. Duke engages in business activities and commerce, as defined by the North Carolina Unfair and Deceptive Trade Practices Act.

112. Duke made false and deceptive representations to Mr. Elmendorf regarding its ability and willingness to provide the specific accommodations Mr. Elmendorf needed.

113. The above-referenced representations were made in the context of Mr. Elmendorf's recruiting visit to Duke. Duke was aware that Mr. Elmendorf was using that visit and a visit to Princeton Theological Seminary as a means of gathering information to determine which school to attend.

114. Duke engaged in "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce" in inducing Mr. Elmendorf to attend Duke instead of Princeton. *See* N.C. Gen. Stat. §75-1.1.

115. Mr. Elmendorf relied on the untrue and deceptive statements made by Duke staff in making his decision to enroll at Duke, and has been harmed and suffered damages as a result.

### FOURTH CLAIM FOR RELIEF
(Negligent Misrepresentation)

116. Mr. Elmendorf incorporates and re-alleges paragraphs 1 through 115.

117. Mr. Elmendorf justifiably relied to his detriment on false information provided to him by Duke's Disability Access office and the Disability Liaison for Duke's Divinity School regarding Duke's ability and willingness to provide the specific accommodations Mr. Elmendorf needed.

118. Duke was aware of the nature of Mr. Elmendorf's need for information regarding available accommodations, and had a duty to use reasonable care in making representations regarding its ability and willingness to provide the requested accommodations.

119. The information provided to Mr. Elmendorf was prepared in the course of Duke's business and without reasonable care.

120. Mr. Elmendorf declined the robust scholarship package offered by Princeton in favor of the smaller scholarship offered by Duke in reliance on the information provided to him about Duke's ability to accommodate his needs as a student with Dyslexia.

121. After Mr. Elmendorf enrolled, Duke failed to provide him with accessible formats of his reading assignments and other accommodations.

122. Mr. Elmendorf relied on inaccurate statements by Duke staff in making his decision to enroll at Duke, and has been harmed and suffered damages as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Bradley Elmendorf respectfully requests that the Court:

A. Declare Defendant's failure to provide equal access to education materials to be discriminatory and a violation of Section 504 of the Rehabilitation Act and the Americans with Disabilities Act;

B. Declare that Defendant engaged in unfair or deceptive trade practices;

C. Declare that Defendant negligently misrepresented its willingness and ability to accommodate Mr. Elmendorf's disability-related needs;

D. Enter judgment in Mr. Elmendorf's favor and in an amount to be determined at trial;

E. Treble damage amounts attributable to Defendant's unfair and deceptive business practices;

F. Award attorneys' fees, expenses, costs, and such other amounts provided by law;

G. Afford Mr. Elmendorf a trial by jury on all issues so triable; and

H. Grant such other relief as may be necessary or appropriate.

Respectfully submitted,

DISABILITY RIGHTS NORTH CAROLINA
3724 National Drive, Suite 100
Raleigh, NC  27612
Telephone: (919) 856-2195
Facsimile: (919) 856-2244

/s/ Holly Stiles
Holly Stiles
holly.stiles@disabilityrightsnc.org
North Carolina Bar No. 38930

/s/ Lisa Grafstein
Lisa Grafstein
lisa.grafstein@disabilityrightsnc.org
North Carolina Bar No. 22076

*Attorneys for Plaintiff*